IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| EGBERT J. DACOSTA, | } | |
| | } | |
| Plaintiff, | } | |
| | } | CIVIL ACTION NO. |
| v. | } | 2:09-cv-2609-WMA |
| | } | |
| THE WATER WORKS BOARD OF THE | } | |
| CITY OF BIRMINGHAM, | } | |
| | } | |
| Defendant. | } | |
| | } | |

**MEMORANDUM OPINION**

Before the court is the motion of the defendant, The Water Works Board of the City of Birmingham ("the Board"), for summary judgment (Doc. 29)[1] as to all claims brought by plaintiff, Egbert J. DaCosta ("DaCosta"). DaCosta filed a responsive brief and the Board replied. Dacosta, who is Indian and a former employee of the Board, brought this action against the Board for race, age, and national origin discrimination, as well as retaliation. For the reasons that follow, the Board's motion for summary judgment will be granted in part and denied in part.

**FACTS**

The following facts, which because of the procedural posture are presented in the light most favorable to DaCosta, are not an exhaustive account of the events surrounding DaCosta's termination

---

[1]Reference to a document number, ["Doc.___"], refers to the number assigned to each document as it is filed in the court's record.

or alleged discrimination.  Instead, this opinion recounts only those facts necessary to demonstrate the existence of a genuine issue of material fact which precludes a grant of summary judgment, and to comply with the requirement of Rule 56(a) that the court state its reasons.  The facts as presented herein are established only for the purpose of summary judgment, and would have to be proven by DaCosta at trial.[2]  This is not the first time that DaCosta has been before the court asserting discrimination and retaliation claims against the Board.  DaCosta sued the Board in June 2003 and the court's decision in favor of the Board was affirmed by the Eleventh Circuit. *See DaCosta v. Birmingham Water Works & Sewer Board*, 256 Fed. Appx. 283 (11th Cir. 2007)("*DaCosta I*").

DaCosta is a forty-eight year old male of Indian heritage, originally from the continent of Asia, currently residing in Birmingham, Alabama.  The Board is an Alabama public corporation incorporated pursuant to Ala. Code § 11-50-230 *et seq.* and provides drinking water to the Birmingham municipal area as well as several surrounding counties.  DaCosta was hired by the Board as a computer operator in Birmingham, Alabama in March of 1997.

The two adverse employment actions which form the basis of DaCosta's case are that he did not receive a performance evaluation

---

[2]*See Johnson v. Stein Mart, Inc.*, 2011 WL 3962819 at *8 n.2 (11th Cir. Sept. 9, 2011) ("These are the facts for summary judgment purposes only. They may not be the actual facts").

for 2007 and such alleged failure affected his merit increase, and that he was terminated.

On February 15, 2008, DaCosta filed a charge of discrimination, Charge No. 420-2008-01348 ("Charge I"), with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of national origin, as well as retaliation.[3]

After filing Charge I, on February 18, 2008, DaCosta returned to work from a period of medical leave pursuant to the Family Medical Leave Act ("FMLA"). Within twenty-one days of returning to work, on March 7, 2008, DaCosta was terminated. The Board's termination letter to DaCosta stated the following:

> The reason for terminating your employment is for unprofessional conduct and communications to other employees and members of management, including abusive language and derogatory comments made to and about other employees and members of management. Some of your comments could be interpreted to be threatening in nature. Your conduct has created morale problems within the IT department, and disrupted the work of others. Your email communications have been used in a manner which is offensive, derogatory, and insubordinate, and disruptive to the effective operation of this organization. You have abused the complaint system, and used it to attempt to intimidate and harass others, including

---

[3]DaCosta disputes that his February 15, 2008 charge of discrimination was based solely on national origin and retaliation. (Doc. 33, at 2). DaCosta states that "[a]lthough [he] only checked those boxes, his charge clearly mentions discrimination on the basis of race." *Id.* His charge states that he "was refused training and education, whereas, a Black [] male who is classified the same as I am, was afforded the training and education." (Doc. 19, Ex. A). Also, the charge states that a white female "was awarded a reimbursement check for education...." *Id.*

management, and done so in an inappropriate manner. You have been grossly insubordinate to your supervisors and chain of command.

(Doc. 34, Ex. 14).

Following his termination, on August 22, 2008, DaCosta filed a second charge of discrimination, Charge No. 420-2008-03365 ("Charge II"), alleging discrimination on the basis of race, national origin, age, and disability, as well as retaliation.

The EEOC issued DaCosta a Right to Sue Letter, with respect to Charge I, on October 6, 2009.  DaCosta received a Right to Sue Letter as to Charge II on November 4, 2009.

On December 30, 2009, DaCosta filed this complaint.  In his amended complaint, DaCosta asserts eight separate causes of action: (1) race discrimination under Title VII of the Civil Rights act of 1964 ("Title VII"); (2) national origin discrimination under Title VII; (3) retaliation under Title VII; (4) race discrimination under 42 U.S.C. § 1981 ("§ 1981"), by and through 42 U.S.C. § 1983; (5) retaliation under § 1981, by and through § 1983; (6) age discrimination under the Age Discrimination in Employment Act of 1967 ("ADEA"); (7) age discrimination under the Alabama Age Discrimination in Employment Act ("AADEA"); and (8) retaliation under FMLA.  In his brief, DaCosta states that he elects not to pursue his claims under the ADEA and AADEA.  Since DaCosta has abandoned these two claims, the Board's motion for summary judgment will be granted as to COUNT SIX and COUNT SEVEN.

4

**DISCUSSION**

I.   <u>COUNT ONE</u> - Race Discrimination-Wrongful Termination under Title VII and <u>COUNT FOUR</u> - Race Discrimination under § 1981

Proving a violation of § 1981 and Title VII , where the facts for each claim are the same, involves the same standards and analytical framework. *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (holding that Title VII and § 1981 claims are analyzed in the same manner). As such, DaCosta's race discrimination claims under Title VII and § 1981 will be analyzed together.

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of an individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). Section 1981 protects an individual's right to be free from racial discrimination in the "making, performance, modification, and termination of contracts...." 42 U.S.C. § 1981.[4]

Because DaCosta's race discrimination claims are based entirely on circumstantial evidence, in order to prove his *prima facie* case, DaCosta must demonstrate that: (1) he is a member of a

---

[4]DaCosta alleges the same set of facts with his national origin claim as he does with his race discrimination claim.

protected class; (2) he was qualified to perform the duties of his position; (3) he was subjected to an adverse employment action; and (4) he was treated less favorably than similarly-situated employees outside his protected class. *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Once a plaintiff has made out a *prima facie* case, the burden of going forward shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its decision. *MacPherson v. University of Montevallo,* 922 F.2d 766, 774 (11th Cir. 1991) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).   Once the defendant has articulated a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the defendant's reason is pretextual.   *Id*.

**2007 evaluation**

DaCosta alleges that (1) he was the only Indian member of the IT Department and the only member of the IT Department who did not receive an evaluation for 2007, that (2) he was not given the right to review or appeal his 2007 evaluation, and that (3) this failure affected his rate of pay for 2008.[5]   In his amended complaint,

---

[5]Although DaCosta did not receive a sit-down meeting for his evaluation, the Board actually input DaCosta's performance numbers into the computer system.   DaCosta's complaint is based on the fact that he did not receive a sit-down meeting or the chance to review his evaluation, and therefore, that he did not

DaCosta states that "[e]valuations are directly related to the amount of pay an employee receives, and the Board's failure to evaluate [DaCosta] resulted in [DaCosta] receiving lower pay in 2008." (Doc. 19, at 7).[6]

To support a claim under Title VII, "the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). "[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries, Inc.*, v. *Ellerth*, 524 U.S. 742, 761 (1998). "[A]n employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Davis*, 245 F.3d at 1239. The Eleventh Circuit has held that actions that affect a pay raise can constitute an adverse employment action. *Gillis v. Ga. Dep't of Corrections*, 400 F.3d 883, 887 (11th Cir. 2005). In his brief, DaCosta states that "[w]hile DaCosta had previously 'topped out' at

_____

receive the right to appeal his 2007 evaluation.

[6]This allegation is contradicted by DaCosta's deposition testimony, where he testified that he did receive higher pay in 2008.

his then-current grade of 12, DaCosta was to move to grade 13 in 2008, and as a result would no longer have been at the maximum pay range for his grade." (Doc. 33, at 29).  DaCosta points to Gene Brown, a black male, who held the same position as DaCosta, to illustrate Brown as a comparator who allegedly received his 2007 evaluation during the calendar year (prior to December 31st).  Brown also received a merit increase based on his 2007 evaluation.

The Board does not dispute that DaCosta did not receive an evaluation for 2007.  Instead, the Board's proffered non-discriminatory reason is that DaCosta went on FMLA leave in December 2007 and did not return to work until February 2008.  At the same time, DaCosta's supervisor, Greg Singleton ("Singleton"), was also on leave for at least a portion of that time due to his mother's cancer and death, and therefore, Singleton was not available to provide DaCosta with his evaluation.  The Board's general manager, Macaroy Underwood ("Underwood"), testified that the Board's evaluation process starts with a supervisor entering evaluation ratings into the Board's computer system which would be reviewed again prior to being given to the employee.  Thus, an employee would have an evaluation rating in the system prior to actually receiving his or her evaluation in person to review. Underwood further explained that because the Board's computer system would have the preliminary ratings, even if the employee did not actually receive his evaluation until after the first of the

8

year, the employee would still receive a merit and cost of living raise based upon the scores in the system. (Underwood depo., at 64-65).

DaCosta argues that the Board's explanation is pretextual by alleging that the Board did not follow its own evaluation procedure. DaCosta states that it is the Board's "practice to show the evaluation to the employee and provide him or her with a chance to review it and to respond to it." (Doc. 33, at 31). The fact that DaCosta was not given the right to review or appeal his 2007 evaluation, in spite of the fact that all employees get the right to do so, does not show a violation warranting a finding of pretext. DaCosta claims that the failure to evaluate him affected his merit increase. Yet, DaCosta himself testified that his pay grade was changed from 12 to 13 and that he received a merit increase in 2008 based on his score on his 2007 evaluation. (DaCosta depo., at 78, 79, 208, 209-210). Underwood testified that DaCosta actually received both a merit increase and a cost-of-living adjustment despite not receiving his 2007 evaluation. (Underwood depo., at 65-66). The Board's manager of the human resources department, Paul Lloyd ("Lloyd"), also confirmed DaCosta's testimony when he stated that "[d]espite not reviewing Mr. DaCosta's 2007 evaluation with him prior to his termination, Mr. DaCosta received a merit increase based on his annual performance review rating and cost of living increase effective the

first pay period in 2008." (Doc. 34-24, affidavit of Paul Lloyd). Even though DaCosta did not have a chance to review and respond to his 2007 evaluation, he still received the increase in pay grade that he complains of.

DaCosta also erroneously argues that he was the only member of the IT department who did not receive an evaluation in 2007. Underwood testified that all employees are typically evaluated between October 1 and December 31 each year. (Underwood Depo., p.30).   However, Underwood also testified that on several occasions, some employees are not evaluated until January or February, for whatever the reason may be. *Id*.   In his brief, DaCosta states that "Brown himself informed [DaCosta] that he had received [his 2007 evaluation] when [DaCosta] inquired." (Doc. 33, at 30).   Yet, DaCosta also testified that he cannot recall whether he asked Brown this question before he went on FMLA leave in December 2007 or after he returned to work in February 2008. Evidence presented by the Board shows that Gene Brown was actually not evaluated until January 3, 2008. (Doc. 30-9, Ex. 6, 2007 Evaluation for Gene Brown).   Similarly, Tonya Levert (Mixon), also of the IT department, did not receive her evaluation until January 8, 2008. (Doc. 36-3, at 7).   Thus, DaCosta was not the only employee of the IT department who did not receive an evaluation during the 2007 calendar year.   Therefore, DaCosta's attempt to illustrate Brown as a comparator is woefully inadequate.   The fact

that DaCosta's evaluation was not completed before December 31, 2007 does not show a violation of the Board's policies or procedures.   DaCosta has failed to present any evidence that he was treated differently from any other employees in the IT department and has failed to rebut the Board's articulated non-discriminatory reason.   Thus, the Board's motion for summary judgment will be granted as to DaCosta's discrimination claims surrounding his 2007 evaluation.

**Termination**

In regard to DaCosta's disparate treatment claims under Title VII and § 1981 for wrongful termination, DaCosta must prove that the Board acted with discriminatory purpose. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002).   A plaintiff discharged for misconduct must show that "the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002).   DaCosta is a member of a protected class and was terminated, but he must also demonstrate that other employees not in his protected class acted in a similar manner as himself but were retained by the Board.

To determine whether employees are similarly situated, the court "require[s] that the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-

guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)).  It is DaCosta's burden to show that the misconduct for which he was discharged was nearly identical to that engaged in by an employee outside his protected class whom the employer did not discharge.  At his deposition, DaCosta testified that he did not know of any non-Indian employees accused of the same misconduct that were not fired. (DaCosta depo., at 131-132).  However, in his brief, and contrary to his deposition testimony, DaCosta points to four employees as potentially valid comparators: Jesse Inman, Greg Singleton, Jane Smith, and Gene Brown. None of these individuals are a valid comparator.

DaCosta attempts to argue that Jesse Inman ("Inman"), white, had violent tendencies and posed a risk to other employees. DaCosta illustrates an incident where Inman allegedly threw newspapers all over the place and yelled at DaCosta. (Doc. 33, at 35).  This incident was alleged in DaCosta's **previous** lawsuit, in which the Eleventh Circuit affirmed summary judgment in favor of the Board. (Doc. 36-5, DaCosta depo. from *DaCosta I*, at 101-102). The court does not find Inman to be a true comparator when Inman's alleged misconduct is not similar nor "nearly identical" to DaCosta's misconduct for which he was terminated.

DaCosta also describes an incident where Inman threw a chair

12

out the door of his office and into the hallway for the proposition that Inman had violent tendencies and posed a risk to other employees. Once again, this incident was alleged in DaCosta's **previous** lawsuit. (Doc. 36-5, *DaCosta I*, at 278-279). Since the Board did not terminate Inman, DaCosta baldly asserts that Inman is a valid comparator. The court does not think so. Inman's alleged misconduct is not similar and surely not "nearly identical" to DaCosta's misconduct. Therefore, Inman is not a valid comparator.

DaCosta alleges that Jane Smith stated that Inman imitated DaCosta's accent. (Doc. 33, at 35). Even assuming this hearsay is true and admissible, it does not equate to "nearly identical" misconduct for which DaCosta was terminated. One alleged instance of imitating an accent is an ordinary tribulation of the workplace and does not fall within the purview of Title VII. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006).

DaCosta points to Singleton, white, as a purported comparator because Singleton allegedly said to DaCosta, "[t]hat's why your wife's tits fell off." (Doc. 33, at 36). According to DaCosta, his wife had previously suffered from breast cancer, and in his brief he states that "[i]t is difficult to imagine a more heartless, cruel, and hurtful statement than this one." (Doc. 33, at 36). Singleton denies having made this statement. No where in the record does the court find that DaCosta was accused of, or

13

terminated for, any similar comments DaCosta might have made to another employee.  Thus, Singleton is not a valid comparator.

DaCosta points to Jane Smith, white, and Gene Brown, black, as comparators regarding insubordination because they did not sign their performance evaluations, and DaCosta was written up for refusing to sign the employee handbook.  The situations are distinguishable because all employees must sign the employee handbook, whereas employees are free to not review or to not sign their performance evaluations.  Again, DaCosta has failed to show that Brown or Smith are valid comparators.  DaCosta has not demonstrated that other IT employees were similarly situated. DaCosta was terminated for a variety of reasons, and DaCosta has not demonstrated that his purported comparators experienced the same litany of performance issues afflicting him.

For its proffered non-discriminatory reasons, the Board submits the same reasons given to DaCosta in his termination letter.  Specifically, DaCosta was terminated for unprofessional conduct and communications, comments which could be interpreted as threatening, creating morale problems in the workplace, abuse of the complaint system, and insubordination.  For the comments considered to be "threatening in nature" the Board illustrates an incident where DaCosta told Singleton that he would "clean house" regarding management of the Board.  Singleton testified that DaCosta was very upset with management at the time he made this

14

statement. (Singleton depo., at 107).  DaCosta even testified that
he had previously received several disciplinary action forms
regarding workplace violence threats. (DaCosta depo., at 121-123 ).
Underwood testified that DaCosta challenged his supervisors on work
directives, was disrespectful to his supervisor in the way in which
he referred to his supervisor as "this guy," and sent numerous
emails on a daily basis or every other day to his supervisors and
members of management.  These were not one, two, or three line
emails. (Underwood depo., at 49).  These were one page to a page-
and-a-half emails. *Id*.  In these emails, DaCosta would complain
about directions given to him by a supervisor or management and
would take issue with the directions instead of following the
directions. (Underwood depo., at 15).  These emails were considered
to be insubordinate, and further, they were considered to be an
abuse of the complaint system in that DaCosta sent them so
frequently.  Underwood also testified that the Board considered
DaCosta was using these emails to harass and intimidate his
supervisors.  Singleton testified that DaCosta was insubordinate
in his daily dealings with him.  Singleton testified that DaCosta
would talk back to him and argue with him over work assignments,
and DaCosta would walk away when Singleton was talking to him about
assignments. (Singleton depo., at 39, 103, 104).

      The Board has articulated non-discriminatory reasons to
terminate DaCosta which were based on the belief that he engaged in

inappropriate and insubordinate conduct. DaCosta was an "at-will" employee. The court will not second-guess the business decisions of the Board. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether **each** of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000)(emphasis added).

Assuming *arguendo* that DaCosta has established a *prima facie* case, he still cannot rebut the Board's articulated, non-discriminatory reasons are a pretext for discrimination. To show pretext, DaCosta must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000)(internal citation omitted). The Board's articulated reasons are not pretext for discrimination "'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). With pretext, the focused inquiry requires DaCosta to demonstrate "'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Rioux v. City of Atlanta*, 520 F.3d 1269, 1275 (11th Cir. 2008)(quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  DaCosta has failed to do so.

DaCosta has only offered his opinion that the Board's reasons for terminating him were pretext.  However, opinions and conclusions are insufficient to withstand summary judgment.  The question is not whether DaCosta agrees with the Board's reasons for firing him.  Rather, "our inquiry is limited to whether the employer's choice is an honest choice, that is, whether the employer acted in good faith and had reasonable grounds to believe that the disciplined employee engaged in the misconduct." *Bennett v. Chatham County Sheriff Dep't,* 315 Fed. Appx. 152, 160 (11th Cir. 2008)(internal quotations omitted). *See also Standard v. A.B.E.L Servs., Inc.,* 161 F.3d 1318, 1333 (11th Cir. 1998) ("the heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons").  "[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated." *Alexander v. Fulton County, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000)(*overruled on other grounds by Manders v. Lee,* 338 F.3d 1304 (11th Cir. 2003)).

DaCosta has not presented any evidence that would cause a reasonable jury to question the credibility of the Board's reasons for its actions.  Where a plaintiff is terminated for multiple reasons, he must show that all such reasons were pretextual.  *Chapman,* 229 F.3d at 1025 (11th Cir. 2000).  Accordingly, the Board's motion for summary judgment will be granted as to DaCosta's wrongful termination claims in COUNT ONE and COUNT FOUR.

## II.   <u>COUNT TWO</u> - National Origin discrimination under Title VII

DaCosta complained that he was not treated in the same manner as employees whose national origin was the United States. (Doc. 19, at 11).[7]  Because DaCosta cannot invoke § 1981, he only invokes Title VII for his national origin discrimination claim.  DaCosta has failed to present any evidence of any dispute of material fact that he was treated differently from another employee who was not from India.  For the same reasons set forth herein as to DaCosta's Title VII and § 1981 disparate treatment claims, the Board's motion for summary judgment will be granted as to COUNT TWO.

## III.   <u>COUNT THREE</u> & <u>COUNT FIVE</u> - Retaliation under Title VII and § 1981[8]

---

[7]DaCosta briefed his national origin discrimination claim under Title VII in the same section as his race discrimination claims. (Doc. 33, at 24, n.9).  Since the elements for a national origin discrimination claim under Title VII are the same as race discrimination under Title VII, the court's analysis from Section I will apply to DaCosta's national origin discrimination claim.

[8]The elements to required to establish a claim of retaliation are the same for both Title VII and Section 1981.

In order to prove a *prima facie* case of retaliation under Title VII, DaCosta must show (1) that he engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the protected activity. *Gregory v. Georgia Dept. of Human Resources*, 355 F.3d 1277, 1279 (11th Cir. 2004). The first two prongs are not disputed.

DaCosta contends that the filing of Charge I with the EEOC on February 15, 2008 was the reason for which the Board terminated him. DaCosta maintains that the temporal proximity between his filing of Charge I on February 15, 2008, his return from FMLA leave on February 18, 2008, and the date of his termination, March 7, 2008, provides sufficient circumstantial evidence of a causal connection to establish a *prima facie* case under Title VII and FMLA.

In the Eleventh Circuit, the causal link requirement is construed broadly so that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Goldsmith v. Bagby Elevator Co. Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (internal citations omitted). "'In

---

*See Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008). Since the elements are the same, and the counts are virtually identical, the court will address both counts together.

order to show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.'" *Id.* It is undisputed that DaCosta had a pending EEOC charge when he was terminated. However, the Board argues that it had already contemplated terminating DaCosta in December 2007, prior to DaCosta's FMLA leave, and prior to the filing of Charge I. DaCosta contends that the timing of these two events alone establishes circumstantial evidence of a causal relation. As DaCosta suggests, "[c]lose temporal proximity between protected conduct and an adverse employment action is generally 'sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)(quoting *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000)); *see also Donnellon v. Fruehauf Corp.,* 794 F.2d 598, 601 (11th Cir. 1986)(holding that an adverse employment action occurring within one month of an employee's protected activity is sufficient, in and of itself, to satisfy the causal connection requirement).

The Board cites *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006), for the proposition that "when an employer **contemplates** an adverse employment action **before** an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show

20

causation." (Emphasis added).   However, in *Drago*, "the record
evidence [was] overwhelming" that the employer contemplated the
adverse action prior to the protected activity. *Id.*  In the instant
case, the record evidence and articulated reasons proffered by the
Board merely include testimony of **current** employees of the Board.
DaCosta has shown that a reasonable jury could disbelieve that the
Board contemplated firing DaCosta prior to his FMLA leave and prior
to his filing of Charge I.

Here, the Board had employed DaCosta for approximately eleven
years when, only twenty-one days after he filed Charge I, and only
eighteen days following his return from FMLA leave, the Board
terminated his employment.  There is a dispute of material fact as
to when the Board actually made the decision to terminate DaCosta.

The evidence presented creates a triable issue of fact as to
whether the Board retaliated against DaCosta.  Such a question of
fact cannot be decided as a matter of law.  It is for a jury to
decide.  The Board's motion for summary judgment will be denied as
to COUNT THREE and COUNT FIVE.

IV.   <u>COUNT EIGHT</u> - Retaliation under FMLA

To state a retaliation claim under the FMLA, DaCosta must show
that the Board "intentionally discriminated against him in the form
of an adverse employment action for having exercised an FMLA
right." *Strickland v. Water Works and Sewer Bd. of City of
Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001).  DaCosta faces an

21

increased burden of showing that the Board's actions "'were motivated by an impermissible retaliatory or discriminatory animus.'" *Id.*(internal citation omitted). Since DaCosta is relying on circumstantial evidence to show the Board's retaliatory motive, the court applies the same burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating Title VII discrimination claims.[9]

The parties dispute when the decision to terminate DaCosta was made. Although DaCosta was not terminated until March 7, 2008, Underwood testified that they "were in the process of preparing paperwork to terminate [DaCosta] [in December]" but they put it off due to DaCosta's FMLA claim. (Underwood depo., at 27). DaCosta alleges that the decision was made only after the Board became aware of DaCosta's request for FMLA leave and after his filing of Charge I. DaCosta points out that, in its statement of position to the EEOC, the Board "made no mention of any decision to terminate DaCosta, or any discussions about termination, in December 2007." (Doc. 33, at 19). But instead, the Board stated in its position that DaCosta was terminated on March 7, 2008. (Doc. 33, Ex. 23, at 2).

Again, DaCosta relies on the temporal proximity between his filing of Charge I, his return from FMLA leave, and his termination to prove a causal connection. Although the Board re-articulates

---

[9]*See* Section III, *supra*.

the same non-discriminatory reasons for terminating DaCosta as set out previously herein, there remains a dispute of material fact as to whether the Board retaliated against DaCosta in relation to his FMLA leave.  This is a question for a reasonable jury to decide. Therefore, the Board's motion for summary judgment will be denied as to COUNT EIGHT.

**CONCLUSION**

For the foregoing reasons, the Board's motion for summary judgment will be granted in part and denied in part.  The Board's motion for summary judgment will be **GRANTED** as to COUNTS ONE, TWO, FOUR, SIX and SEVEN.  The Board's motion for summary judgment will be **DENIED** as to COUNTS THREE, FIVE, and EIGHT.  It will be interesting to see whether DaCosta dismisses his retaliation claims before trial or proceeds before a jury on his multi-motivational theory.  A separate order effectuating this opinion shall be entered.

DONE this 16th day of December, 2011.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE